## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JULIE LANE and RICHARD LANE,<br><br>                Plaintiffs,<br><br>v.<br><br>DIRECT ENERGY SERVICES, LLC,<br><br>                Defendant. | Civil Action No. 3:19-cv-674<br><br><br>Class Action Complaint |

Plaintiffs Julie and Richard Lane ("the Lanes" or "Plaintiffs"), by their attorneys, Levin, Papantonio, Thomas, Mitchell, Rafferty & Proctor, P.A., and Finkelstein, Blankinship, Frei-Pearson & Garber, LLP, as and for their class action complaint, allege, with personal knowledge as to their own actions, and upon information and belief as to those of others, as follows:

### NATURE OF THE CASE

1.      This action seeks to redress Direct Energy Services, LLC's ("Direct Energy" or "Defendant") deceptive, bad faith, and unfair pricing practices that have caused thousands of consumers to pay considerably more for their electricity than they should otherwise have paid.

2.      Defendant engages in a classic bait-and-switch deceptive and unfair marketing scheme aimed at consumers hoping to save on the cost of electricity.  It lures consumers into switching electricity providers by offering an initial fixed rate for a limited number of months that is lower than local utility electricity rates.  Once that initial rate expires, Direct Energy switches its customers to a variable rate "based upon generally prevailing market prices for electricity."  In reality, Defendant's variable rates are substantially higher than those otherwise available in the electricity market, and its rates do not reflect changes in market conditions for

the electricity it supplies to its retail customers.  As a result, unsuspecting consumers are being overcharged millions of dollars in exorbitant charges for electricity.

3.      This suit is brought pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. Ann. § 505/1 *et seq.*, and the common law on behalf of a class of Direct Energy residential customers in Illinois who were charged a variable rate for electricity by Direct Energy from June 2009 to the present.  This suit seeks, *inter alia*, injunctive relief, actual damages, treble damages, punitive damages, attorneys' fees, and the costs of this suit.

## PARTIES

4.      Plaintiffs Julie Lane and Richard Lane are citizens of Illinois residing in Centralia, Illinois.  The Lanes contracted with Defendant Direct Energy for residential electricity services in or around June 2016, and remained Direct Energy customers through approximately August 2018.  As a result of Defendant's deceptive and unfair conduct, Plaintiffs incurred excessive charges for electricity.

5.      Defendant Direct Energy Services, LLC is a limited liability company organized under the laws of Delaware, with its principal place of business in Houston, Texas.  Defendant is an alternative retail energy supplier, providing electricity services to residential customers in the United States, including Illinois, where Defendant is currently licensed to operate.  Defendant has tens of thousands of customers in Illinois, and tens of millions of dollars in revenues.

## JURISDICTION

6.      Defendant's status as limited liability company renders it an "unincorporated association" pursuant to the Class Action Fairness Act ("CAFA"), and under CAFA, an unincorporated association is a citizen of the state where it has its principal place of business and the state under whose laws it is organized.  *See* 28 U.S.C. § 1332(d)(10).

7.      The Court has personal jurisdiction over Defendant because it has substantial connection with Illinois connected to the subject matter of this suit.  Direct Energy sells electricity and natural gas supplies to tens of thousands of Illinois consumers, including to Plaintiffs, and those sales that are the subject matter of this lawsuit.

8.      Subject matter jurisdiction in this civil action is authorized pursuant to 28 U.S.C. § 1332(d), as minimal diversity exists, there are more than 100 class members, and the amount in controversy is in excess of $5 million.

## OPERATIVE FACTS

9.      In 2002, Illinois made the decision to deregulate the market for retail residential electricity supply.  Among the goals of the reorganization were increased competition and deregulation within the industry, with an eye towards achieving greater consumer choice and an overall reduction of energy rates.  As a result, the Illinois' electricity industry is open to competition, and consumers may choose their energy supplier.

10.     The new energy suppliers, who compete against local utilities, are known as alternative retail electric suppliers or "ARESs."  While ARES supply the electricity, local utilities continue to deliver the commodity to consumers' homes.  The local utility also continues to bill the customer for both the energy supply and delivery costs.  The only difference to the customer is whether the utility or an ARES sets the price for the customer's energy supply.

11.     The public policy motivation for allowing consumers a choice of energy suppliers is to enable retail customers to take advantage of increased competition between suppliers in the open market.  The fundamental purpose behind this policy is that competition would result in ARESs being more aggressive and creative than the utility in reducing wholesale purchasing costs and thereby lower prices for retail customers.

12.     Consumers who do not choose to switch to an ARES for their energy supply continue to receive their supply from their local utility.

13.     In Illinois, the Illinois Power Agency develops electricity procurement plans and conducts competitive electricity procurement processes on behalf of Illinois utilities in order to ensure that utility customers receive competitive retail rates for electricity.

14.     A third-party consultant manages competitive procurement auctions on behalf of the Illinois Power Agency.  Through these auctions, utilities purchase electricity at competitive wholesale prices on a multi-year rolling basis (which Illinois refers to as a "laddered" approach) on behalf of its customers.  The bidding processes and results are made publicly available.  As a result, these auctions reflect market-determined prices based on prevailing market conditions. Utilities then charge their customers a rate based on market prices for supply obtained in the competitive wholesale marketplace, plus other wholesale costs, namely transmission, capacity, ancillary, congestion, and administrative costs (*i.e.*, the same costs ARESs such as Direct Energy incur) -- without any markup or profit.  Because Illinois utility rates do not include any profits, they accurately reflect average market costs of wholesale electricity and associated costs over time.

15.     By contrast, ARESs such as Defendant have various options to buy electricity at wholesale for resale to retail customers, including: owning electricity production facilities;

purchasing electricity from wholesale marketers and brokers at the price available at or near the time it is used by the retail consumer; and by purchasing electricity in advance of the time it is used by consumers, for example purchasing futures contracts for the delivery of electricity in the future at a predetermined price. The purpose of deregulation is to allow ARESs to use these and other innovative purchasing strategies to reduce electricity costs, and pass those savings on to consumers.

16.     Therefore, ARESs should be able to offer rates competitive with, or substantially lower than, utilities' rates, and in fact many do. Indeed, Direct Energy offered fixed rates during the time Plaintiffs were Direct Energy customers that were competitive with or much lower than Illinois utilities' rates.

17.     As part of the deregulation plan, ARESs (like Direct Energy) do not have to file or seek approval for the electricity rates they charge or the methods by which they set their rates with the Illinois Commerce Commission.

18.     Direct Energy exploits deregulation and the lack of regulatory oversight in the energy market to deceptively charge consumers exorbitant rates for electricity. In fact, Defendant's rates are substantially higher than its own fixed rates, rates charged by other ARES, and rates charged by local utilities, and are untethered from changes in wholesale prices.

19.     As any reasonable consumer would expect, there are only two aspects of market conditions that affect Direct Energy's sales of electricity to consumers: supply side, as reflected in the state of wholesale market pricing (wholesale costs make up the vast majority of ARESs' costs to provide retail electricity) and demand side, as reflected in the rates Direct Energy's competitors charge retail customers.

20.     In or around June 2016, Direct Energy offered to provide the Lanes a fixed rate to be followed by a market-based variable rate for electricity services.  Direct Energy's fixed–rate offer was lower than their local utility's (Ameren's) then-current rate.

21.     After the Lanes expressed interest in enrolling in Direct Energy's electricity services, Direct Energy provided them with its standard and uniform Illinois Residential & Small Commercial Terms and Conditions (the "Terms and Conditions").

22.     The representation that Defendant's variable rate would be based on electricity market prices was reinforced by Defendant's standard Terms and Conditions, which, after the rescission period, would come to govern their relationship.  Specifically, the Terms and Conditions prominently stated that, upon the expiration of the initial fixed rate, Plaintiffs would be automatically transferred to Direct Energy's variable rate plan, where "Direct Energy will charge you at a variable price per kWh based upon generally prevailing market prices for electricity in the PJM market for Commonwealth Edison Company customers or the MISO market for Ameren customers; at the Electric Utility load zone for the applicable period, plus an adder, determined solely by Direct Energy in its discretion."  That is, Direct Energy represented that the new variable rate would be predicated upon prevailing market prices for electricity in the MISO market.

23.     The Terms and Conditions also provided the Lanes with a rescissionary period during which they could rescind the contract prior to its commencement should they not agree to its terms.  During that rescissionary period, the contract served as a solicitation in which Defendant identified the basis upon which the promised market-based variable rate would be determined.

6

24.     Direct Energy sends a uniform renewal letter to all of its customers whose fixed rates are expiring, in which it represents that Direct Energy's rate offerings are "competitive."

25.     Any reasonable consumer would understand based on these representations that Defendant's variable rate would be competitive and would fluctuate based on prevailing local market conditions.  Any reasonable consumer would understand that the two components of market prices are wholesale prices and the retail prices other competitors (namely the local utility and other ARESs) charge.  The Lanes thus reasonably expected that Direct Energy's variable rates for electricity would reflect prevailing market prices, *i.e.*, the rates Direct Energy's competitors charge and wholesale costs for purchasing electricity, and fluctuations thereof.

26.     But such a consumer would be wrong, because Direct Energy's variable rate does not reflect wholesale electricity prices and it is invariably substantially higher than competitors' rates.

27.     The following table identifies the last 17 billing periods (beginning with the Lanes' April 2017 bill) during which the Lanes were enrolled in Direct Energy's electricity supply services, the rates Direct Energy charged the Lanes, the corresponding rate Ameren would have charged (which, as discussed above, is a reasonable representation of a rate based on wholesale market conditions), the differences between Direct Energy's and Ameren's contemporaneous rates, and Direct Energy's rates as a percentage of Ameren's contemporaneous rates:

| Billing Period | Direct Energy Rate Per kWh[1] | Ameren Rate Per kWh | Difference Per kWh | Direct Energy's Rate As A Percentage Of Ameren's Rate |
|---|---|---|---|---|
| 3/21/17 – 4/19/17 | $0.0559 | $0.0600 | -$0.0041 | 93.22% |
| 4/19/17 – 5/18/17 | $0.0716 | $0.0600 | $0.0116 | 119.26% |
| 5/18/17 – 6/19/17 | $0.1073 | $0.0493 | $0.0580 | 217.51% |
| 6/19/17 – 7/19/17 | $0.1158 | $0.0495 | $0.0664 | 234.12% |
| 7/19/17 – 8/17/17 | $0.1205 | $0.0504 | $0.0701 | 239.13% |
| 8/17/17 – 9/18/17 | $0.1218 | $0.0504 | $0.0714 | 241.84% |
| 9/18/17 – 10/17/17 | $0.1239 | $0.0585 | $0.0654 | 211.89% |
| 10/17/17 – 11/16/17 | $0.1231 | $0.0591 | $0.0640 | 208.20% |
| 11/16/17 – 12/18/17 | $0.1171 | $0.0607 | $0.0564 | 192.93% |
| 12/18/17 – 1/21/18 | $0.1137 | $0.0609 | $0.0528 | 186.77% |
| 1/21/18 – 2/19/18 | $0.1102 | $0.0608 | $0.0493 | 181.06% |
| 2/19/18 – 3/20/18 | $0.1211 | $0.0588 | $0.0623 | 205.86% |
| 3/20/18 – 4/19/18 | $0.1265 | $0.0588 | $0.0677 | 215.14% |
| 4/19/18 – 5/20/18 | $0.1215 | $0.0596 | $0.0620 | 204.03% |
| 5/20/18 – 6/19/18 | $0.1189 | $0.0436 | $0.0754 | 273.03% |
| 6/19/18 – 7/19/18 | $0.1166 | $0.0441 | $0.0725 | 264.32% |
| 7/19/18 – 8/19/18 | $0.1153 | $0.0429 | $0.0724 | 268.69% |

28.     As explained above, Ameren is Direct Energy's primary competitor in the Lanes' service territory, and Ameren's rates encompass the average wholesale price of electricity and associated costs over time without any markup, making it an ideal comparator.

29.     Direct Energy transferred the Lanes to its variable rate in April 2017, such that the Lanes' first variable rate billing period was April 19 to May 18, 2017.

---

[1] Electricity is sold to consumers by the kilowatt hour, or kWh.

30.     That Direct Energy's variable rate is not in fact a competitive market rate is demonstrated by the fact that Defendant's rate was consistently significantly higher than Ameren's rates.  Between May 2017 and August 2018—the entire time the Lanes were on Direct Energy's variable rate—Direct Energy's rate was higher than Ameren's rate *every month*.  On average, Direct Energy's variable rates were 216.5% of Ameren's rates (*i.e.*, Direct Energy's variable rates were 2.165x Ameren's rates).  Direct Energy's rate was *more than double* Ameren's rate during 12 of the 16 months the Lanes were on Direct Energy's variable rate.

31.     Direct Energy's failure to base its variable rate on market prices is likewise evidenced by the variable rate's failure to fluctuate in accordance with changes in Ameren's (*i.e.*, its primary competitor's) rate.

32.     Remarkably, the discrepancies between fluctuations in Direct Energy's variable rate and utility prices begin immediately upon transfer to the variable rate and remain evident throughout the Lanes' 16 months on the variable rate.  When Direct Energy transitioned the Lanes to its variable rate, Direct Energy's rate jumped from $0.0559 to $0.0716 per kWh (increasing 28%), while Ameren's rate remained steady at $0.0600 per kWh.  Direct Energy proceeded to increase its variable rate over the next few months, despite market fluctuations.  For example, Direct Energy drastically increased its rate from $0.0716 per kWh in May 2017 to $0.1218 per kWh between May and June 2017 (increasing 50%), whereas Ameren's rate decreased from $0.0600 to $0.0493 per kWh during the same period (decreasing 18%).  Likewise, between February and April 2018, Direct Energy's rate increased its already exorbitant rate from $0.1102 to $0.1265 per kWh (increasing 15%), while Ameren's rate steadily decreased from $0.0608 to $0.0588 per kWh (decreasing 3%).

33.     Even when the rates trended in the same direction, the differences remain glaring. For instance, when Ameren's rates slightly rose from $0.0493 to $0.0504 per kWh between June and September 2017 (rising 2%), Direct Energy's variable rate increased from $0.1073—already more than double its primary competitor's rate—to $0.1218 per kWh (increasing 14%). Similarly, between May and June 2018, Ameren's rate steadily decreased from $0.0596 to $0.0436 per kWh (decreasing 27%), whereas Direct Energy's rate merely decreased from $0.1215 to $0.1189 per kWh (decreasing 2%).

34.     A reasonable consumer would understand that a price based on prevailing local market prices would be competitive with the price charged by Direct Energy's competitors' rates, namely its primary competitor Ameren.  But Direct Energy's variable rate was never competitive with Ameren's rate.  Thus, Direct Energy's rates are not in fact based on market prices otherwise available in the retail market.

35.     Moreover, Direct Energy has a tactical advantage over the utility as it can purchase electricity from any number of markets using any number of purchasing and hedging strategies, and therefore its cost for purchasing electricity should at the very least reflect—if not undercut—utility prices.

36.     Instead, Direct Energy's rates are unfathomably and consistently higher than the local utility's rates.

37.     Direct Energy's variable rate also was consistently substantially higher than other electricity rates available in the market, including its own fixed rates and introductory rates.

38.     For example, the Lanes' initial fixed rate was $0.0559 per kWh, and Direct Energy's current fixed–rate offerings in Plaintiffs' service area still include the same fixed rate of $0.0559 per kWh.  *See Residential Electricity Plans for Ameren Area*, DIRECT ENERGY,

https://www.directenergy.com/illinois/electricity-plans (last visited May 21, 2019).  Meanwhile,

Direct Energy charged Plaintiffs an average variable rate of $0.1153 per kWh in the interim

period (roughly double what it charged its fixed rate customers).

39.     Direct Energy's rates are not competitive with those of other ARESs either.  In

fact, according to U.S. Energy Information Administration's data, in 2016, Direct Energy's rates

were higher than approximately 70% of the 52 ARESs providing residential electricity services

in Illinois.  *See 2016 Retail Power Marketers Sales -- Residential*, U.S. ENERGY INFORMATION

ADMINISTRATION, http://bit.ly/2pgWXpO (last visited May 20, 2019).

40.     A reasonable consumer also would understand and expect that "prevailing market

prices" for retail electricity would include the wholesale price for electricity, that is, the market

price available to Direct Energy for the electricity it in turn supplies to its retail customers.

41.     However, Direct Energy's variable rate rarely reflects or varies with wholesale

market prices.

42.     The following table identifies the most recent 17 billing periods during which the

Lanes were enrolled in Direct Energy's electricity supply services, Direct Energy's rates for that

period, the "MISO All-In Rate Per kWh," the differences between Direct Energy's rates and

contemporaneous wholesale prices, and Direct Energy's rates as a percentage of

contemporaneous wholesale prices.  The Midcontinent Independent System Operator, Inc.

("MISO") is an energy market administrator and updates the market rate for wholesale electricity

on an hourly basis.  The MISO market price is the benchmark used to establish the price of

electricity purchases and sales in specific geographic locations.  The "MISO All-In Rate Per

kWh" below reflects Day-Ahead MISO prices adjusted upward to reflect that more electricity is

purchased when demand, and consequently electricity prices, are higher, and also includes the

other wholesale costs an ARES incurs for selling electricity (namely, transmission, capacity, ancillary, and congestion costs) in Ameren's service territory.  Direct Energy was and is capable of purchasing electricity (inclusive of associated costs) at wholesale at these prices.

| Billing Period | Direct Energy Rate Per kWh | MISO All-In Rate Per kWh | Difference Per kWh | Direct Energy's Rate As A Percentage Of MISO All-In Rate |
|---|---|---|---|---|
| 3/21/17 – 4/19/17 | $0.0559 | $0.0340 | $0.0219 | 164% |
| 4/19/17 – 5/18/17 | $0.0716 | $0.0340 | $0.0376 | 210% |
| 5/18/17 – 6/19/17 | $0.1073 | $0.0290 | $0.0783 | 370% |
| 6/19/17 – 7/19/17 | $0.1158 | $0.0335 | $0.0823 | 346% |
| 7/19/17 – 8/17/17 | $0.1205 | $0.0285 | $0.0920 | 423% |
| 8/17/17 – 9/18/17 | $0.1218 | $0.0350 | $0.0868 | 348% |
| 9/18/17 – 10/17/17 | $0.1239 | $0.0285 | $0.0954 | 435% |
| 10/17/17 – 11/16/17 | $0.1231 | $0.0280 | $0.0951 | 440% |
| 11/16/17 – 12/18/17 | $0.1171 | $0.0275 | $0.0896 | 426% |
| 12/18/17 – 1/21/18 | $0.1137 | $0.0410 | $0.0727 | 277% |
| 1/21/18 – 2/19/18 | $0.1102 | $0.0270 | $0.0832 | 408% |
| 2/19/18 – 3/20/18 | $0.1211 | $0.0270 | $0.0941 | 448% |
| 3/20/18 – 4/19/18 | $0.1265 | $0.0300 | $0.0965 | 422% |
| 4/19/18 – 5/20/18 | $0.1215 | $0.0335 | $0.0880 | 363% |
| 5/20/18 – 6/19/18 | $0.1189 | $0.0320 | $0.0869 | 372% |
| 6/19/18 – 7/19/18 | $0.1166 | $0.0315 | $0.0851 | 370% |
| 7/19/18 – 8/19/18 | $0.1153 | $0.0330 | $0.0823 | 349% |

43.     The discrepancy between changes in wholesale prices and Direct Energy's variable rate demonstrates that Direct Energy's rates do not reflect changes in market conditions. For example, the wholesale price of electricity declined from $0.0340 to $0.0290 per kWh

between April and June 2017 (declining 15%), while Direct Energy's rates nearly doubled from $0.0559 to $0.1073 per kWh (increasing 92%).  Likewise, wholesale prices declined from $0.0285 to $0.0350 per kWh from July to August 2017 (declining 23%), while Direct Energy's rate increased from $0.1158 to $0.1205 per kWh (increasing 4%).  Between September and November 2017, wholesale costs decreased from $0.0350 to $0.0280 per kWh (declining 20%), whereas Direct Energy's variable rate increased from $0.1218 to $0.1239 per kWh (increasing 2%), and subsequently slightly decreased to $0.1231 per kWh (declining less than 1%).  Similarly, wholesale prices steeply declined from $0.0410 to $0.0270 per kWh (decreasing 34%) between January and March 2018, while Direct Energy's rate slightly decreased from $0.1137 to $0.1102 per kWh (decreasing 3%), and then increased to $0.1211 per kWh (increasing 10%).

44.    No reasonable consumer who is told that their variable rate would be predicated on prevailing local market conditions would expect that Direct Energy's rate would frequently increase despite decreases in wholesale electricity prices.

45.    Direct Energy is aware that its variable rate does not reflect market conditions or fluctuate in accordance with market conditions and that it makes no efforts to ensure that its rates are competitive, in spite of its representations to its consumers.

46.    The cost of wholesale electricity is the primary component of the non-overhead costs Direct Energy incurs.  As explained above, the other cost factors that may affect its variable rate in (such as capacity, ancillaries, transmission costs, transportation costs, and line losses) are included in Ameren's and other ARESs' rates as well.  Yet, Ameren and other ARESs offer substantially lower rates, just as Direct Energy itself continues to do for its fixed–rate offerings.

47.    Therefore, these other cost factors cannot justify Defendant's egregiously high variable rate or their discrepancy from prevailing retail and wholesale prices.

13

48.     Additionally, Defendant's ability to make a profit, which it refers to as an "adder," does not justify its outrageously high rates.  A reasonable consumer might understand that an ARES will attempt to make a reasonable profit by selling consumers retail electricity.  However, such a consumer would also expect that such profits would be consistent with profit margins obtained by other electricity suppliers in the market, and also that Defendant's profiteering at the expense of its customers would not be so extreme that its rates bear no relation to market prices.

49.     No reasonable customer, including the Lanes, would interpret Direct Energy's Terms and Conditions to mean that Direct Energy can exercise unfettered discretion to artificially inflate its rates—so much so that the rates bear no resemblance to wholesale prices and competitors' rates—in order to maximize profits at the expense of its customers.

50.     Direct Energy's statements regarding its electricity rates are materially misleading, as the most important consideration for any reasonable consumer when choosing an energy supplier is price.  No reasonable consumer who knows the truth about Direct Energy's exorbitant rates would choose Direct Energy as an electricity supplier.  All that Direct Energy offers customers is electricity delivered by local utilities, a commodity identical to electricity supplied by other ARESs or local utilities.  Other than potential price savings, there is nothing to differentiate Direct Energy from other ARESs or local utilities, and the potential for price savings is the only reason any reasonable consumer would enter into a contract for electricity supply with Direct Energy.

51.     Direct Energy knows that it charges variable rates that are unconscionably high, and its misrepresentations regarding the rates being based on market conditions were made for the sole purpose of inducing customers to purchase electricity from Direct Energy so that it could reap unconscionable profits to the detriment of consumers.  Therefore, Direct Energy's actions

were actuated by actual malice or accompanied by wanton and willful disregard for the well–being of consumers.

52.     Indeed, Defendant's scheme, which often affects our nation's most vulnerable citizens, is immoral, unethical, oppressive, and unscrupulous.

### Rule 9(b) Allegations

53.     To the extent necessary, as detailed in the paragraphs above and below, Plaintiffs have satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity:

54.     WHO:

- Direct Energy, acting through its corporate personnel, makes material misrepresentations and omissions of fact in the marketing, advertising, promotion, and sale of electricity.

55.     WHAT:

- Direct Energy makes material misrepresentations and omissions by marketing, advertising, promoting, and selling its variable rate as a competitively-priced rate that would be "based upon generally prevailing market prices for electricity."

- The language that Direct Energy uses in its Terms and Conditions and renewal letters falsely and deceptively creates the impression that its variable rate would be based on wholesale costs of electricity and competitors' rates.  Direct Energy makes these misrepresentations with respect to its variable rate even though it knows that its variable rate will not be based on market prices as the variable rate does not reflect wholesale prices or its competitors' rates.  Direct Energy fails to

inform customers that there are undisclosed factors it considers that are not prevailing market prices as any reasonable consumer would understand that term.

- Indeed, Direct Energy knows its representation that the variable rate is competitive and based on prevailing market prices is false because it does not meaningfully consider wholesale prices or the rates charged by utilities or other ARESs when it sets the variable rate. No reasonable consumer exposed to Direct Energy's representations would expect that there would be no connection between market prices and Direct Energy's variable rates.

56. WHERE:

- Direct Energy makes its material misrepresentations and omissions in its standard Contract Summary and Terms and Conditions, which constitute a solicitation during the rescission period, and in Direct Energy's standard renewal notice, all of which were received by Plaintiffs and upon which Direct Energy intended Plaintiffs to rely.

57. WHEN:

- Direct Energy made the material misrepresentations and omissions when it solicited the Lanes in or around June of 2016 by providing them with its deceptive standard Terms and Conditions, and again when it sent the Lanes its standard renewal notice guaranteeing competitively-priced rates. Direct Energy makes the same or substantially similar misrepresentations and omissions of material facts to all of its potential customers when it solicits them by using the same or substantially similar Contract Summary, Terms and Conditions, and renewal notice.

58.    WHY:

* Knowing that price is the most fundamental factor in choosing an energy supplier, Direct Energy makes these claims with respect to its variable rate with the purpose of inducing the Lanes and other prospective customers to switch to its electricity supply services.  By deceptively inducing customers to switch to its energy supply, Direct Energy has successfully reaped millions in profits at the expense of its unsuspecting customers.

59.    HOW:

* Direct Energy makes material misrepresentations and fails to disclose material facts concerning its variable rate when marketing, advertising, promoting, and selling its electricity services by representing that its variable rate is a competitively-priced rate that will be "based upon generally prevailing market prices for electricity in the PJM market for Commonwealth Edison Company customers or the MISO market for Ameren customers; at the Electric Utility load zone for the applicable period."  In reality, Direct Energy makes no effort to price its variable rate competitively with either the local utilities or competing ARESs, and there is no correlation between Direct Energy's variable rate and market conditions.  Instead, Direct Energy's rate is consistently higher than that of its primary competitor (the local utility) as well as rates charged by other ARESs, and is invariably higher than its own teaser and fixed rates.  Direct Energy further fails to disclose that it artificially inflates its variable rates, which are realized as profits.

### Class Action Allegations

60.     Plaintiffs bring this action on their own behalf and additionally, pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, on behalf of a class of Direct Energy customers in Illinois who were charged a variable rate for residential electricity services by Direct Energy from June 2009 to the present (the "Class).

61.     Excluded from the Class is Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which Defendant has or had a controlling interest, or which Defendant otherwise controls or controlled; and any officer, director, employee, legal representative, predecessor, successor, or assignee of Defendant.

62.     This action is brought as a class action for the following reasons:

a.     The Class consists of thousands of persons and is therefore so numerous that joinder of all members, whether otherwise required or permitted, is impracticable;

b.     There are questions of law or fact common to the Class that predominate over any questions affecting only individual members, including:

i.     whether Defendant violated 815 Ill. Comp. Stat. Ann. § 505/1 *et seq.*;

ii.     whether Defendant breached its contracts with consumers by charging variable rates not based on market conditions;

iii.     whether Defendant breached the covenant of good faith and fair dealing by exercising its unilateral price-setting discretion in bad faith, *i.e.*, to price gouge or upset the reasonable expectation of consumers that Direct Energy variable rates would be competitive and reflect changes in the wholesale price of electricity;

iv. whether Plaintiffs and the Class have sustained damages and, if so, the proper measure thereof; and

v. whether Defendant should be enjoined from continuing to charge exorbitant rates based on factors other than market conditions.

c. The claims asserted by Plaintiffs are typical of the claims of the members of the Class;

d. Plaintiffs will fairly and adequately protect the interests of the Class, and Plaintiffs have retained attorneys experienced in class and complex litigation, including class litigation involving consumer protection and ARESs;

e. Prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendant;

f. Defendant has acted on grounds that apply generally to the Class, namely representing that its variable rates are based on market conditions when its rates are in fact always substantially higher, so that final injunctive relief prohibiting Defendant from continuing its deceptive practices is appropriate with respect to the Class as a whole;

g. A class action is superior to other available methods for the fair and efficient adjudication of the controversy, for at least the following reasons:

i. Absent a class action, Class members as a practical matter will be unable to obtain redress, Defendant's violations of its legal obligations will continue without remedy, additional consumers and purchasers will be harmed, and Defendant will continue to retain its ill-gotten gains;

ii.      It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions;

iii.     When the liability of Defendant has been adjudicated, the Court will be able to determine the claims of all members of the Class;

iv.     A class action will permit an orderly and expeditious administration of Class claims, foster economies of time, effort, and expense, and ensure uniformity of decisions;

v.      The lawsuit presents no difficulties that would impede its management by the Court as a class action; and

vi.     Defendant has acted on grounds generally applicable to Class members, making class-wide monetary and injunctive relief appropriate.

63.     Defendant's violations of 815 Ill. Comp. Stat. Ann. § 505/1 *et seq.* and the common law are applicable to all Class Members, respectively, and Plaintiffs are entitled to have Defendant enjoined from engaging in illegal and deceptive conduct in the future.

## FIRST CAUSE OF ACTION
### Violation of 815 Ill. Comp. Stat. Ann. § 505/1 *et seq.*

64.     Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs 1 through 62 as if fully set forth herein.

65.     The Illinois Consumer Fraud and Deceptive Business Practices Act prohibits, *inter alia*:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . .

815 Ill. Comp. Stat. Ann. § 505/2.

66.     Defendant's unfair and false, deceptive, and misleading statements and omissions with respect to the rates charged for electricity, as described above, constitute affirmative misrepresentations in connection with the marketing, advertising, promotion, and sale of electricity in violation of the Consumer Fraud and Deceptive Business Practices Act.

67.     Defendant's unfair and false, deceptive, and misleading statements and omissions were material to Plaintiffs and would be material to any potential consumer's decision to purchase electricity from Defendant.

68.     Defendant also failed to inform customers that its rates are substantially higher than those based on market conditions.  Defendant further failed to disclose that its variable rates were artificially inflated to maximize profits at the expense of its customers.  That information was material to Plaintiffs and would be material to any consumer deciding whether to purchase electricity from Defendant.

69.     Defendant made these unfair, false, deceptive, and misleading statements and omissions with the intent that consumers rely upon such statements.

70.     Defendant's –gouging scheme, which often affects Illinois' most vulnerable citizens, is immoral, unethical, oppressive, and unscrupulous.  Victims of Direct Energy's scheme cannot avoid it; once Direct Energy has charged its exorbitant rate, consumers can only pay the amount charged or risk having their electricity shut off.  In Illinois, this can be a life-threatening issue in the depths of the summer and winter.  Moreover, Direct Energy's customers are not informed that Direct Energy is price gouging them, and reasonable consumers paying a market–based variable rate trust that the ARES providing them service will not charge a rate divorced from market conditions about which they are not, as private individuals, ordinarily privy.  That Direct Energy's rates are higher than rates charged by 7 out of 10 other ARES

demonstrates how radically it has departed from commercial norms.

71.     Defendant's price–gouging scheme offends public policy.  The purpose of deregulation is to allow ARES like Direct Energy to offer competitive rates to benefit consumers. Direct Energy offers nothing of value to consumers; instead, it takes advantage of deregulation, and the difficulty consumers face in determining when market conditions change such that a market variable rate should be higher or lower, to charge excessive rates, secure in the knowledge that the public utility commission no longer has the authority to curb its behavior.

72.     Direct Energy's price–gouging behavior causes consumers significant and substantial pecuniary injury.

73.     Plaintiffs and other Class Members entered into agreements to purchase electricity from Defendant and suffered ascertainable loss as a direct and proximate result of Defendant's actions in violation of the Consumer Fraud and Deceptive Business Practices Act.

74.     As a consequence of Defendant's wrongful actions, Plaintiffs and the other Class Members suffered an ascertainable monetary loss based on the difference in the rate they were charged versus the rate they would have been charged had Defendant charged a competitive rate based on market conditions or had they not switched to Defendant from their previous supplier.

75.     Plaintiffs and other Class Members suffered an ascertainable loss caused by Defendant's misrepresentations and omissions because they would not have entered into an agreement to purchase electricity from Defendant if the true facts concerning its rates had been known.

76.     By reason of the foregoing, Defendant is liable to Plaintiffs and other Class Members for trebled compensatory damages; punitive damages; attorneys' fees, and the costs of this suit.  815 Ill. Comp. Stat. Ann. § 505/10(a).

77.     Defendant knows that it charges variable rates that are unconscionably high, and its misrepresentations regarding the rates being based on market conditions were made for the sole purpose of inducing consumers to purchase electricity at excessive and inflated prices without regard to the consequences high utility bills cause such consumers.  Defendant's conduct was intentional, wanton, willful, malicious, and in blatant disregard of, or grossly negligent and reckless with respect to, the life, health, safety, and well-being of Plaintiffs and the other Class Members.  Defendant therefore is additionally liable for punitive damages, in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### Violation of 815 Ill. Comp. Stat. Ann. § 505/2GG

78.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 76 as if fully set forth herein.

79.     The Illinois Consumer Fraud and Deceptive Business Practices Act requires that "[a]ny advertisement for electric service that lists rates shall clearly and conspicuously disclose all associated costs for such service including, but not limited to, access fees and service fees." 815 Ill. Comp. Stat. Ann. § 505/2GG.

80.     "The term 'advertisement' includes the attempt by publication, dissemination, solicitation or circulation to induce directly or indirectly any person to enter into any obligation or acquire any title or interest in any merchandise and includes every work device to disguise any form of business solicitation by using such terms as 'renewal', 'invoice", 'bill', 'statement', or 'reminder', to create an impression of existing obligation when there is none, or other language to mislead any person in relation to any sought after commercial transaction."  815 Ill. Comp. Stat. Ann. 505/1(a).

81.     During the rescissionary period, Direct Energy's Contract Summary and Terms

and Conditions serves as a solicitation in which Defendant identifies the purported market–based pricing methodology for its variable rate.

82.     Defendant's solicitations failed to clearly and conspicuously disclose Direct Energy's variable rate pricing methodology and associated costs for electricity services.

83.     Plaintiffs and other Class Members suffered an ascertainable loss caused by Defendant's unfair misrepresentations and omissions because they would not have entered into an agreement to purchase electricity from Defendant if the true facts concerning its rates had been known.

84.     By reason of the foregoing, Defendant is liable to Plaintiffs and other Class Members for trebled compensatory damages; punitive damages; attorneys' fees, and the costs of this suit.  815 Ill. Comp. Stat. Ann. § 505/10(a).

85.     Defendant's conduct was intentional, wanton, willful, malicious, and in blatant disregard of, or grossly negligent and reckless with respect to, the life, health, safety, and well-being of Plaintiffs and the other Class Members.  Defendant therefore is additionally liable for punitive damages, in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### Breach of Contract & Breach of the Implied Covenant of Good Faith and Fair Dealing

86.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 84 as if fully set forth herein.

87.     Plaintiffs and the Class entered into valid contracts with Defendant for the provision of electricity supply.

88.     Pursuant to that contract, Defendant agreed to charge a variable rate for electricity that would be "based upon generally prevailing market prices for electricity in the PJM market for Commonwealth Edison Company customers or the MISO market for Ameren customers; at

24

the Electric Utility load zone for the applicable period."

89.     Pursuant to the contract, Plaintiffs and the Class agreed to pay Defendant's rate, and they did so.

90.     However, Defendant failed to perform its obligations under the contract because it charged a variable rate not based on market prices, *i.e.*, the wholesale price of electricity and competitors' rates.

91.     Plaintiffs and the Class were damaged as a result because they were billed, and they paid, a charge for electricity that was higher than it would have been had Defendant based the rate on prevailing market prices.

92.     By reason of the foregoing, Defendant is liable to Plaintiffs and the rest of the Class for the damages that they have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial, plus attorneys' fees.

93.     Additionally, every contract contains an implied covenant of good faith and fair dealing in the performance and enforcement of the contract.  The implied covenant is an independent duty and may be breached even if there is no breach of a contract's express terms.

94.     Plaintiffs reasonably expected that Defendant would attempt to make a reasonable profit in setting its rates and selling electricity to consumers.  Nonetheless, Plaintiffs reasonably expected that the variable rates for electricity would, notwithstanding Defendant's profit goals, reflect market prices, including competing rates and the MISO wholesale price of electricity, and that Defendant would refrain from price gouging.  Without these reasonable expectations, Plaintiffs and other Class Members would not have agreed to buy electricity from Defendant.

95.     Defendant breached the implied covenant of good faith and fair dealing by arbitrarily and unreasonably exercising its unilateral rate-setting discretion to seek profit margins

that were commercially unreasonable, thereby price gouging and frustrating Plaintiffs' and other

Class Members' reasonable expectations that the variable rate for electricity would reflect market

prices, including competing rates and wholesale electricity prices.

96.     As a result of Defendant's breach, Defendant is liable to Plaintiffs and other Class

Members for actual damages in an amount to be determined at trial and attorney's fees.

**FOURTH CAUSE OF ACTION**
**Unjust Enrichment**

97.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 95

above as if fully set forth herein.

98.     This cause of action is pled in the alternative to Plaintiffs' contract claims.  To the

extent the Court determines that a valid contract exists between the parties, Plaintiffs do not

intend to proceed with his unjust enrichment claim.

99.     Plaintiffs and the Class members conferred a tangible economic benefit upon

Defendant by contracting with Defendant for electricity.  Plaintiffs and the Class Members would

not have contracted with Defendant for electricity had they known that Defendant would charge

rates substantially in excess of those charged by local utilities.

100.     By engaging in the conduct described above, Defendant has unjustly enriched

itself and received a benefit beyond what was contemplated by the parties, at the expense of

Plaintiffs and the Class.

101.     It would be unjust and inequitable for Defendant to retain the excessive payments

Plaintiffs and the Class made for electricity supply.

102.     By reason of the foregoing, Defendant is liable to Plaintiffs and the other Class

Members for the damages that they have suffered as a result of Defendant's actions, the amount

of which shall be determined at trial.

WHEREFORE, Plaintiffs respectfully request that the Court should enter judgment against Defendant as follows:

1.      Ordering appropriate injunctive relief;

2.      Certifying this action as a class action, with a class as defined above, and appointing the undersigned as class counsel;

3.      On Plaintiffs' First Cause of Action, awarding against Defendant damages that Plaintiffs and other Class Members have suffered, trebled, and granting appropriate injunctive relief;

4.      On Plaintiffs' Second Cause of Action, awarding against Defendant damages that Plaintiffs and other Class Members have suffered, trebled, and granting appropriate injunctive relief;

5.      On Plaintiffs' Third Cause of Action, awarding against Defendant damages that Plaintiffs and the other members of the Class have suffered as a result of Defendant's actions;

6.      On Plaintiffs' Fourth Cause of Action, awarding against Defendant damages that Plaintiffs and other members of the Class have suffered as a result of Defendant's actions;

7.      Awarding Plaintiffs and the Class punitive damages;

8.      Awarding Plaintiffs and the Class interest, costs and attorneys' fees; and

9.      Awarding Plaintiffs and the Class such other and further relief as this Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Federal Rule of Civil Procedure Rule 38, Plaintiffs hereby demand a trial by jury.

27

Dated:  June 21, 2019
         Chicago, Illinois

                              /S/ William F. Cash III
                              WILLIAM F. CASH III

                              William F. Cash III (IL Bar No. 6330856)
                              Matt Schultz* (FL Bar No. 640328)
                              **LEVIN, PAPANTONIO, THOMAS,**
                              **MITCHELL, RAFFERTY & PROCTOR, P.A.**
                              111 West Washington St., Ste. 1240
                              Chicago, IL 60602
                              Tel: (850) 435-7059
                              Fax: (850) 435-7020
                              bcash@levinlaw.com
                              mschultz@levinlaw.com


                              D. Greg Blankinship*
                              Todd G. Garber*
                              Chantal Khalil*
                              **FINKELSTEIN, BLANKINSHIP,**
                              **FREI-PEARSON & GARBER, LLP**
                              445 Hamilton Avenue
                              White Plains, New York 10601
                              Tel: (914) 298-3281
                              Fax: (914) 824-1561
                              gblankinship@fbfglaw.com
                              tgarber@fbfglaw.com
                              ckhalil@fbfglaw.com


                              * *Pro Hac Vice Application Forthcoming*

                              *Attorneys for Plaintiffs and the Putative Class*